IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MASTERS ENTERTAINMENT )
GROUP, INC., )
            )
    Plaintiff, )          NO. 3:18-cv-01314
            )          JUDGE RICHARDSON
v.          )
            )
DALE AURICH and )
BOBBY L. RABER, d/b/a )
HUMVEE DESIGNS, )
            )
    Defendant. )

## MEMORANDUM OPINION

Pending before the Court are two motions for summary judgment. The first is Plaintiff's "Motion (For Partial Summary Judgment)" (Doc. No. 57, "Plaintiff's Motion"), supported by a memorandum in support (Doc. No. 58); Defendants have filed a response in opposition to Plaintiff's Motion (Doc. No. 66), to which Plaintiff has filed a reply (Doc. No. 73). The second is "Defendants' Motion for Summary Judgment" (Doc. No. 60, "Defendants' Motion"), supported by a memorandum in support (Doc. No. 61); Plaintiff has filed a response in opposition to Defendants' Motion (Doc. No. 69), to which Defendants have filed a reply (Doc. No. 74). These motions ("cross-motions") are ripe for decision.

## PLAINTIFF'S ALLEGATIONS[1]

Plaintiff alleges that on August 8, 2017, it entered into an Agreement (Doc. No. 12-1, "Agreement") with "Humvee Designs"[2] to provide services to Humvee Designs in the form of

---

[1] These allegations are set forth in Plaintiff's Second Amended Complaint (Doc. No. 36). They are not accepted as true for purposes of the cross-motions, because each of the cross-motions seeks summary judgment. Instead, they are provided here to provide context for the below-discussed factual and legal issues implicated by the cross-motions.

[2] Humvee Designs is identified in the Agreement as the "Sponsor."

production of a cable TV network series (which Defendants later titled "American Metal") for a total cost of $254,000, payable by Humvee Designs to Plaintiff in installment payments ending August 10, 2018. (Doc. No. 12-1).

Plaintiff contends that it fully performed all its obligations under the Agreement and that Defendants have failed to pay the final portions of its fee. Plaintiff also alleges that Defendants misrepresented to Plaintiff the nature of "Humvee Designs" by representing to Plaintiff that it was a formal business entity when in fact it was not. Plaintiff alleges that Defendants represented that they were founders of Humvee Designs and that Humvee Designs had the full right and legal authority to "grant the rights granted" in the Agreement and to "perform its obligations" therein. (*See* Doc. No. 12-1 at 2).

Plaintiff asserts that in April 2018, for reasons then unknown to Plaintiff, Defendants instructed Plaintiff to replace the name Humvee Designs with "Hero Customs" in the cable TV network series Plaintiff was producing for Defendants.[3] Plaintiff alleges that it advised Defendants that the Agreement would need to be changed accordingly, and asked whether Hero Customs was a limited liability company (LLC), a corporation, or some other form of business entity. In response, according to Plaintiff, Defendant Raber assured Plaintiff that Hero Customs was merely "a DBA" of Humvee Designs and that no amendment to the Agreement was necessary. Plaintiff contends that it nonetheless, mailed an Addendum to the Agreement to Defendants to substitute Hero Customs for Humvee Designs and that Defendants refused to sign it. Plaintiff avers that Defendants now claim that Plaintiff had actually contracted with an Arizona limited liability company formerly known as HMMWV Designs, LLC ("HMMWV"), not with Humvee Designs. Plaintiff alleges that it never contracted with HMMWV or Hero Customs.

---

[3] Plaintiff contends that this "replacement" came about because Defendants were infringing the Humvee trademark owned by AM General.

Plaintiff also avers that Defendants did not have legal authority to use the name "Humvee" but rather were appropriating for their own use and profit the goodwill and value developed by the owner of the Humvee trademark, AM General, LLC. Plaintiff asserts that, when the cable TV network was notified by AM General that Defendants were infringing its Humvee trademark, the network pulled all episodes of "American Metal" off the air. In response to AM General's identification of infringing uses and the network's pulling of all episodes of "American Metal," Defendant Aurich instructed Plaintiff to take the necessary steps to accommodate AM General's demands regarding Defendants' infringing uses of AM General's trademark. Plaintiff claims it then began the "painstaking and expensive process" of reviewing and editing the remaining episodes to remove the infringing content, resulting in at least $60,000 in lost revenue and out-of-pocket expenses.

Plaintiff further alleges that Defendants have failed to pay all amounts due under the Agreement. Specifically, according to Plaintiffs, as of October 18, 2018, Defendants owed (and yet refused to pay) an outstanding balance of $69,000, not counting accrued late fees and interest.[4]

Plaintiff also alleges that Defendants, representing themselves to be co-owners of a trademark ("American Metal trademark"),[5] essentially a logo comprising a stylized mountain stacked on top of the words "American" and "Metal," obtained federal registration of the trademark under the Lanham Act. According to Plaintiff, Defendants obtained such registration by fraud. Specifically, Plaintiff alleges that Defendants' representation of ownership of the American

---

[4] The Complaint is unclear as to whether Defendants owe "late fee[s]" in addition to "interest," or whether it uses the term "interest" to refer synonymously to "late fee[s]." (Doc. No. 36 at 15).

[5] This mark is actually a registered *service mark*, rather than *trademark*. (Doc. No. 36-1 at 2). Federal law recognizes a distinction between the two while prescribing that service marks shall be registrable, generally in the same manner and to the same effect as trademark. *See* 15 U.S.C. § 1053. But eschewing such precision, the parties take the well-worn and defensible path of referring to it using the more familiar term of 'trademark," and the Court will do likewise herein.

Metal trademark was false because (according to Plaintiff) Plaintiff actually possessed the rights to that trademark.

## **PROCEDURAL BACKGROUND[6]**

Plaintiff initiated this litigation by filing a complaint in the Circuit Court of Davidson County, Tennessee. Defendants removed the action to this Court based upon diversity jurisdiction. (Doc. No. 1). Thereafter, Plaintiff filed an Amended Complaint. (Doc. No. 12) and a Second Amended Complaint (Doc. No. 36).

In the Second Amended Complaint ("SAC"), Plaintiff asserts in Count I that Defendants breached the Agreement by failing to make complete payment to Plaintiff. In Count II, Plaintiff alleges that Defendants' use of the AM General trademark constituted an unfair and deceptive act or practice in violation of the Tennessee Consumer Protection Act ("TCPA"). In Count III, Plaintiff avers that Defendants are guilty of fraud in the inducement of the Agreement. Finally, in Count IV, Plaintiff alleges false registration of the American Metal trademark. (Doc. No. 36). Plaintiff sought damages (including punitive damages on Count III, treble damages on Count II, and accrued interest on Count I), cancellation of the American Metal trademark, and attorney's fees and costs with respect to multiple counts.

Defendants thereafter filed a motion to dismiss the SAC in part. (Doc. No. 39). That is, Defendants sought dismissal of Counts I and II under Rule 12(b)(6) for failure to state a claim. The Court denied the motion as to Count I, but granted it as to Count II. Accordingly, Counts I, III and IV remain pending.

---

[6] There have been a number of procedural developments in this case that were consequential at least at one point but are not relevant for purposes of the resolving the cross-motions; the Court herein omits any reference to such developments.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56 "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

It is typically stated that the party bringing the summary judgment motion (the movant) has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *See, e.g., Johnson v. Ford Motor Co*., 13 F.4th 493, 502 (6th Cir. 2021) ("'At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact.'" (quoting *White v. Baxter Healthcare Corp*., 533 F.3d 381, 389–90 (6th Cir. 2008)); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). But this is somewhat inexact in the aftermath of 2010 amendments to Rule 56. The movant's initial burden actually is to demonstrate

the absence of a genuine issue of material fact, and not necessarily to demonstrate specifically by referencing portions of the record. True, prior to the 2010 amendments, referencing portions of the record seemed to be the only way to make such a demonstration, and even today that is the primary way to make such a demonstration.[7] But the 2010 amendments added, *inter alia* Rule 56(c)(1)(B), which "recognizes that a party need not always point to specific record materials." Rule 56 2010 Amendment Advisory Committee Note.

Under Rule 56(c)(1)(B), the movant actually has another available means—an alternative to *citing materials in the record*—for demonstrating the absence of a genuine issue of material fact. Specifically, the moving party may meet its initial burden (to indicate the absence of a genuine issue of material fact) by "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support [a material] fact" (for example, the existence of an element of a nonmovant plaintiff's claim). *See* Fed. R. Civ. P. 56(c)(1)(B).[8] However, without attempting to delineate the way(s) in which such a showing could be made without a citation to materials of record, the Court notes that in most cases—given the particular

---

[7] Under the current Rule 56, a party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—still can (and typically does) attempt to support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. *See* Fed. R. Civ. P. 56(c)(1)(A).

[8] More specifically, Rule 56(c)(1)(B), as added in 2010, provides in pertinent part that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). This means, specifically in the case of a party asserting that a fact *cannot be* genuinely disputed (which typically would be the summary judgment *movant*), that its assertion can be supported by "show[ing]"—even without citing materials of record—that the adverse party (typically the *non-movant*) cannot produce admissible evidence to support the fact.

way in which the movant is trying to make this showing—the movant cannot appropriately be credited with having made this showing unless it does cite materials of record.

If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*.[9] "'The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient' to survive summary judgment; rather, 'there must be evidence upon which the jury could reasonably find for the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

"'The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation.'" *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (quoting *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not

---

[9] As suggested by this and the prior sentence when considered together, courts typically (and appropriately) at times refer interchangeably to (i) a party being able to raise a genuine issue as to a fact and (ii) a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "In addition, if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Michigan Dep't of Com.*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322–23; *see also Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "'must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact— and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial.'" (quoting William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).

One important implication from the prior paragraph is that the court should not, in determining whether one side or the other is entitled to summary judgment on a particular claim, take the approach of looking at all relevant evidence from a single perspective and then ask whether the evidence reflects a genuine issue of material fact such that neither party is entitled to summary judgment. Instead, the court must consider the cross-motions separately, viewing the evidence not from a single perspective, but rather from one perspective on one cross-motion and then from a different perspective on the other cross-motion. More specifically, the court must view the evidence in favor of the non-movant on each of the respective cross-motions and ask whether the movant has shown the absence of a genuine issue of material fact even with the evidence viewed in the non-movant's favor.

## DISCUSSION: PLAINTIFF'S MOTION

Plaintiff's Motion is one for partial summary judgment. That is, Plaintiff seeks summary judgment on two (and only two) aspects of its claims: (i) Defendants' liability on Count I; and (ii) Defendants' liability on Count IV. The Court will address each count in turn.

### A. Count I (Breach of Contract)[10]

Plaintiff contends that there is no genuine dispute as to any material fact as to Count I and that Defendants are liable on Count I as a matter of law. Of especial importance, Plaintiff claims that there is no genuine dispute of material fact that Defendants are individually on the hook for any liability that exists with respect to Count I. The Court, assuming for the moment that there is no genuine issue of material fact as to whether liability (for someone or something) exists as to Count I, and that such liability exists (for someone or something) as a matter of law, will address the issue of Defendants' alleged individual liability.

Plaintiff argues that there is no genuine dispute that Defendants, with respect to the business venture here at issue ("the American Metal project") comprised a partnership, by which they evidently mean a general partnership (as opposed to, for example, a limited partnership). More specifically, Plaintiff contends that "Humvee Designs," the party in whose name the Agreement was executed, was a general partnership. (Doc. No. 58 at 5–6). If so, according to Plaintiff, then by law each of the partners (*i.e.*, each Defendant) is liable for the debts of the partnership including liability for the (alleged) breach of the Agreement.

---

[10] The Agreement provides that "any disputes or torts arising pursuant to the [Agreement] shall be judged in the State of Tennessee and under the laws of the State of Tennessee." (Doc. No. 1-1 at 18). Not surprisingly, the parties all seem to accept that in this case, Tennessee law applies to issues of contract law (though not necessarily partnership-formation law).

Plaintiff also points out that "[i]t is a well-settled principal [sic] of law that, in order for an agent to avoid personal liability on a contract negotiated on behalf of the agent's principal, 'the agent must disclose not only the fact of the agency, but also the identity of the principal.'" (Doc. No. 58 at 9 (quoting *ICG Link, Inc., v. Steen*, 363 S.W.3d 533, 550 (Tenn. Ct. App. 2011) (quoting *Siler v. Perkins*, 126 Tenn. 380, 149 S.W. 1060 (Tenn. 1912))). *See also* Doc. No. 36 at 15 ("It is a well-settled principle of Tennessee law that in order for an agent to avoid personal liability on a contract negotiated on behalf of the agent's principal, 'the agent must disclose not only the fact of the agency, but also the identity of the principal.'"). Plaintiff thereby impliedly argues that the quoted proposition supports the notion that Defendants are liable on Count I. But Plaintiff does an inadequate job explaining why and how this principle applies in this case. For example, the Court cannot tell whether Plaintiff asserts this as a basis for Defendants' liability that is alternative to the basis discussed in the paragraph immediately hereabove, or as merely sort of an afterthought to the argument above. And the Court cannot tell whether Plaintiff concedes (as perhaps it should, as discussed below), that that any argument based on the quoted proposition is inconsistent with its argument described in the paragraph immediately hereabove.

These are not the only problems with Plaintiff's implication that the quoted proposition supports a finding that Defendants (both Defendants) are liable on Count I. To begin with, Plaintiff fails to indicate whether the quoted proposition implicates not only Raber but also Aurich (who, unlike Raber, did not sign the Agreement, and thus arguably is not chargeable with having "negotiated" the Agreement as agent on behalf of some principal)—and, if so, why.

Nor does Plaintiff take a position as to whom the undisclosed principal was. Is Plaintiff arguing that it was the general partnership that Plaintiff claims had been formed between the two Defendants? If so, why does Plaintiff say that this general partnership was "undisclosed," given

that the thrust of Plaintiff's primary argument on Count I is that Defendants made it obvious that the principal in this transaction was the partnership that (according to Plaintiff) they had formed? Or is Plaintiff arguing alternatively (and inconsistently, which is not to say *impermissibly*) that the principal actually was an LLC—as opposed to, for example, a general partnership—and that Defendants failed to disclose that the principal was an LLC, or at least failed to disclose the *identity* of that LLC?

In short, to the extent that Plaintiff meant to assert on argument based specifically on the quoted proposition, it is entirely unsupported and undeveloped.[11] Any such argument thus is waived (or perhaps forfeited). *United States v. Rich*, No. 18-2268, 2021 WL 4144059, at *40 (6th Cir. Sept. 13, 2021) ("[I]t is well settled that a party forfeits skeletal arguments"); *United States v. Robinson,* 390 F.3d 853, 886 (6th Cir. 2004) ("We have cautioned that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived, and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (citation and internal quotation marks omitted). Such waiver (or forfeiture) applies in the district as well as the court of appeals. *See, e.g., Northgate Lincoln-Mercury Inc. v. Ford Motor Co.*, 507 F. Supp. 3d 940, 947 (S.D. Ohio 2020) ("'Skeletal' aptly describes [the defendant's] argument on this issue, so the Court considers the

---

[11] The closest Plaintiff comes to clarifying any of these issues is when it asserts that "[f]or the Defendants to claim that they were acting on behalf of a limited liability company requires the specific disclosure of that entity. *See* ICG Link, Inc. *supra*." (Doc. No. 58 at 11). This is insufficient to rise to the level of a non-skeletal argument that Defendants are individually liable on the grounds that they were acting on behalf of an undisclosed principal; indeed, it falls short of actually making a clear assertion (even if only an alternative one) that Defendants were acting on behalf of an undisclosed principal. Plaintiff's above-quoted assertion is flawed also because, contrary to Plaintiff's implication, *ICG Link* does not address what a defendant is allowed to *claim* regarding whether he was acting on behalf of one principal (for example, a particular LLC) as opposed to another principal (for example, a particular general partnership); instead, it addresses whether a defendant is allowed to *avoid liability* based having actually acted for an undisclosed principal. The distinction is important. It is one thing to say that Defendants are liable for acting on behalf of an undisclosed LLC, *if in fact they did act on behalf of an (undisclosed) LLC*. It is quite another to say that Defendants cannot claim that *in fact they were acting on behalf of an LLC* (albeit perhaps an undisclosed one) rather than a general partnership.

argument waived."); *Levine v. Comm'r of Soc. Sec.*, No. 2:17-CV-13201, 2018 WL 6537167, at *16 (E.D. Mich. Oct. 31, 2018) (deeming an argument "fatally underdeveloped, and thus forfeited"), *report and recommendation adopted*, No. 2:17-CV-13201, 2018 WL 6258512 (E.D. Mich. Nov. 30, 2018).

That leaves Plaintiff's argument that Defendants are liable as general partners with respect to the American Metal project. The initial question is whether Plaintiff has made an initial showing that preliminarily suggests Defendants will be unable at trial to raise a genuine dispute as to whether they formed a general partnership with respect to the American Metal project.[12] Seeking to make such a showing, Plaintiff asserts that: (i) according to the Tennessee Code, a general partnership is formed via "the association of two (2) or more persons to carry on as co-owners of a business for profit," even if those persons did not intend actually intend to become partners or realize that legally their acts would make them partners (Doc. No. 58 at 8-9) (quoting Tenn. Code Ann. § 61-1-202(a)); (ii) "'[i]n Tennessee, the sharing of the profits of a business is prima facie evidence that a partnership exists'" (*id.* at 8) (citing *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991) and Tenn. Code Ann. § 61-1-202(c)(3));[13] (iii) "it is undisputed that both Defendant Auric and Defendant Raber intended to share equally in the profit and expected to be co-owners of the business" (*id.* at 11); (iv) Defendant Raber signed the Agreement on behalf of "Humvee Designs," which was not formally in existence as any kind of legal entity (*id.*); (v) Defendants held themselves out to Plaintiff as a partnership, inasmuch as Defendants repeatedly referred to each other as each other's "partner" (*id.* at 11; Doc. No. 73 at 2); and (vi) Defendants cannot claim to

---

[12] The Court herein makes the reasonable assumption, *arguendo*, that no matter which state's law applies, Plaintiff is correct to assert (as it does invoking first Tennessee law and then Arizona law, (Doc. No. 58 at 9, 11 n.22)) that liability for the debts of a general partnership falls on the individual partners.

[13] *Bass* actually says something a little different (though not materially different) on this point, namely, "the receipt of a share of the profits of that business is prima facie evidence that a partnership exists." *Bass*, 814 S.W.2d at 41.

have been acting on behalf of a limited liability company (as opposed to a general partnership) where (as here, according to Plaintiff) the limited liability company was not specifically disclosed (Doc. No. 58 at 11).

The Court does not take issue with the first of the six points above, which are accurate statements of the law as far as they go.

The second point is problematic on multiple levels, however. First, on the relevant point, *Bass* cites a statutory subsection, Tenn. Code Ann. § 61-1-106(4) that no longer exists. The entire Chapter One of Title 61 was repealed and replaced (by the Revised Uniform Partnership Act) effective January 1, 2002 as reflected in the Compiler's Notes to current Tenn. Code Ann. § 61-1-106, which contains no subsection (4) and clearly does not address the topic(s) former § 61-1-106(4) addressed. Second, Plaintiff has not supported its dubious assumption here that Tennessee rather than Arizona law applies,[14] and third, as for (current) Tenn. Code Ann. § 61-1-202(c)(3),[15] despite its patently imprecise prefatory language,[16] it does not actually address whether a

---

[14] That is, Plaintiff has not established that Tennessee law applies to the issue of whether Defendants formed a general partnership. To the contrary, in response to Defendants' assertion that Arizona law applies on this point, (Doc. No. 66 at 3), Plaintiff's reply did not disagree with Defendants' assertion, but instead merely opined that the analysis was the same whichever state's law was used, because each state has enacted the Revised Uniform Partnership Act. But *Bass*, and the now repealed statute cited by *Bass*, predate Tennessee's enactment of the revised Uniform Partnership Act, and Plaintiff has given the Court no reason to believe that Arizona ever had (let alone now has) either a statute like the one cited in *Bass* or case law saying what *Bass* said ("the sharing of the profits of a business is prima facie evidence that a partnership exists") based on such statute. As for what *Bass* said (which *Bass* may have been compelled to say based on what the statute said), it is deeply unsatisfying for the reasons set forth in a footnote below—namely, the mere fact that "profits of a business" are "shared" is no evidence whatsoever that the business is a partnership and not some other form of business having multiple owners, such as a corporation.

[15] This statute is replicated verbatim under Arizona law in a statute, A.R.S. § 29-1012, that Plaintiff did cite (alternatively to the Tennessee statute) in its reply in support of Plaintiff's motion. (Doc. No. 73 at 2). As Plaintiff notes, the existence of identical statutes is attributable to each state having enacted the Revised Uniform Partnership Act. Notably, Tennessee did so effective January 1, 2002, long after *Bass* was decided.

[16] Subsection (c) begins with the phrase, "[i]n determining whether a partnership is formed, the following rules apply:." However, paragraph (3), sets forth a rule dealing not with "whether a partnership is formed," but rather whether "*a person who receives a share of the profits* [but not as payments for (among other particular things) debt, compensation earned as an independent contractor, wages earned as an employee, or rent] *of a business* is presumed to be a partner in the business." Tenn Code Ann. § 61-1-202(c)(3) (emphasis added). The statute cannot reasonably be construed to

partnership exists, but rather addresses whether a particular individual is a partner (as opposed to, for example, a creditor, an independent contractor, an employee, or a landlord) in a partnership that *does* exist. Contrary to Plaintiff's implication, this statute certainly does not indicate by its terms that "[i]n Tennessee, the sharing of the profits of a business is prima facie evidence that a partnership exists."

Regarding the third point, the Court accepts for purposes of Plaintiff's Motion that Defendant Auric and Defendant Raber each intended to share equally in the profit and expected to be a co-owners of the business. But as noted above, these facts do little if anything to establish that the business that Defendants would co-own, and whose profits they would share equally, was a general partnership rather than some other form of business, such as a corporation or an LLC, whose ownership percentage and profits likewise can be split equally between multiple individuals.

As for the fourth point, the Court accepts that Raber signed the Agreement on behalf of "Humvee Designs" and that Humvee Designs was not formally in existence as any kind of legal entity at the time of signing. The Court also accepts, at least for purposes of Plaintiff's Motion, that these facts serve as evidence that "Humvee Designs" existed, and that it existed as a general partnership rather than as a formal legal entity (*i.e.*, a legal entity unlike a general partnership,

---

create a presumption *as to whether a partnership exists in the first place.* This is not only because the subsection on its face simply does not address the question of whether a partnership exists, but also because it makes no sense for the subsection to be construed to address that question. Any such construction would necessarily be based on the notion that if a person receives a share of the profits of a business, the business presumptively is a general partnership (thus creating the possibility that the person is a partner in such partnership, which the subsection expressly notes is presumed to be the case). But there is no reason whatsoever for a presumption to arise that a general partnership exists merely because "a person receives a share of the profits of [a] business"; if there is a business, and a person receives a share of the profits, there is no reason the person could not be, for example a partner in a limited partnership, or a member of a limited liability company, or a shareholder in a corporation. The fact that a person receives a share of the profits of a business is not probative of whether the business is a general partnership, and it would be absurd for the statute to be construed to find it so probative on that point that a presumption arises that the business must be a general partnership. Accordingly, the Court finds that the Tennessee Supreme Court would not interpret this subsection to set forth a presumption as to whether a particular business is a general partnership (as opposed to some other form of business entity).

whose existence is not cognizable unless and until certain legal formalities are undertaken). But what these facts do not do is suggest (even preliminarily) that Defendants might lack evidence sufficient to support a finding that they did not form a general partnership. This is especially true in light of the fact that on the Agreement itself, Defendant Raber identified himself as the "managing member" (of Humvee Designs); this suggests (albeit not conclusively, especially since Defendant Raber was a layperson who conceivably have used legal terms imprecisely and/or without consciousness of any particular signaling or other effect associated with such terms) that he considered Humvee Designs to be the kind of entity that has a managing member—meaning an LLC.

It is true, as Plaintiff notes, (Doc. No 58 at 9), that Defendants might have (unbeknownst to them) formed what legally amounts to a general partnership even if they did not intend to form a general partnership. However, the fact that Humvee Designs's representative (Defendant Raber) clearly suggested that the contracting party was an LLC is certainly evidence (even if not dispositive evidence) that Defendants were doing something other than forming a general partnership—namely, working towards forming an LLC.

As for the fifth point, Plaintiff does cite to deposition testimony that, upon inspection, indeed indicates that each Defendant referred to the other as his "partner." But this serves at best as only weak evidence that Defendants had formed (or were forming) a partnership. For one thing, the Court entirely accepts Defendants' argument that Defendants' "ref[erences] to each other colloquially as 'partner' is no evidence at all that they were forming a general partnership." (Doc. No. 66 at 7). This is in part because laypersons (like Defendants) indisputably often throw around terms like "partner" without having a particular precise legal meaning in mind. The Court sees no reason to believe that they had in mind the particular legal notion of general partners; indeed, even

if (as is not safe to assume) they had some kind of legal partnership in mind when using the term "partner," it could have been a limited liability partnership, as the term "partner" (and, for that matter, "partnership") can be used in reference to a limited liability partner(ship). *See, e.g.,* Tenn. Code. Ann. § 61-1-901(4) ("'Partner' includes both a general partner and a limited partner."). And a reference to a limited liability partnership is a reference to an entity for whose debts the individual partners are *not* generally liable. *See, e.g*., Tenn. Code. Ann. § 61-1-306(c); A.R.S. § 29-1026(c).

But even if Defendants' references to each other as "partner" is accepted as *some* evidence in support of the notion that Defendants were in a general partnership, this does not get Plaintiff far in showing that there is *no genuine dispute* as to whether they were in a general partnership. In Defendant Raber's deposition testimony where he refers to the pair as having agreed that they would be "equal partners," he immediately thereafter says that "we needed to execute the paperwork, but until that paperwork was done, he was not able to sign on behalf of any corporation." (Doc. No. 58-2 at 4). Likewise, in Defendant Aurich's testimony where he acknowledges that he referred to Defendant Raber as his "partner" in a phone call on June 22, 2017, he immediately thereafter states, "we were going to form a corporation with—[Raber] at the time already had a corporation, and I was gonna be put as a *partner on that corporation* once all the things came together and we decided to do that." (Doc. No. 58-1 at 5). This all makes crystal clear that when Defendants referred to each other as (future) "equal partners," they are referring *not* to being general partners, but rather to being (equal) owners in some other kind of business entity—what Defendants each called a "corporation," by which they (as laypersons) easily could have meant a limited liability company.

And to the extent that Plaintiff here in contending that Defendants can be held liable as individuals based on their allegedly *holding themselves out to Plaintiff* as general partners—as

opposed to based on their allegedly *actually being* partners—the Court does not see where Plaintiff has developed this contention factually or legally. Thus, the Court declines to consider it, other than to note that the claim that Defendants held themselves out as a general partnership is substantially undercut by the fact that, as noted above, Defendant Raber referred to himself as acting on behalf of something that could only have been an LLC.

As for the sixth point, the Court construes it as an argument that Defendants now are effectively estopped from claiming that they were acting on behalf of some principal other than a general partnership comprised of themselves, because the identity of such other now-claimed principal was (according to Plaintiff) not disclosed to Plaintiff at the time in question. The Court cannot accept the apparent implication that individual defendants cannot claim during subsequent litigation to have been acting on behalf of a limited liability company (as opposed to a general partnership) where the limited liability company was not specifically disclosed at the time in question. True, individual defendants generally are individually liable when they were acting as agents on behalf of an undisclosed principal. But that does not mean—and Plaintiff provides no legal authority to suggest—that in the ensuing litigation to determine whether individual defendants are individually liable, the individual defendants cannot assert that they were in fact acting on behalf of a principal who was never disclosed. In short, and as indicated above, it is one thing to say that litigation may result in an agent being on the hook for a transaction the agent undertook on behalf of an undisclosed principal, but it is quite another to say that in such litigation the agent cannot assert its position as to whom the agent actually was. Plaintiff provides no legal support for the latter proposition, *i.e.*, the notion that an agent cannot assert (in an effort to avoid liability based on allegedly having acted on behalf of a general partnership) that he was acting on behalf of a principal that was not in fact a general partnership.

As suggested above, a couple of Plaintiff's points here conceivably could be of some value in gaining Plaintiff traction with a jury as to whether Defendants had formed a general partnership and thus are liable for breach of an agreement that (according to Plaintiff) was entered into by the general partnership. But given the relatively attenuated probativeness of such points, and the flaws in Plaintiff's other points, Plaintiff's points fail to take this issue out of the jury's hands to begin with. Plaintiff fails to meet its initial burden to make a preliminary showing that Defendants would be unable to genuinely dispute that they formed a general partnership (and thus are individually liable for the alleged breach of the Agreement). Thus, the burden never shifts to Defendants to show that they could raise a genuine dispute on this score, and the Court need not even consider the arguments and evidence presented by Defendants to show that they indeed can raise a genuine dispute. Because Plaintiff has failed to demonstrate the lack of a genuine issue of material fact as to whether Defendants are liable for any breach of the Agreement, Plaintiff's Motion must be denied as to Count I.

2.    Count IV: False Registration of Trademark

Plaintiff sets forth a concise argument for why it is entitled to summary judgment as to Count IV:

> In this case, there are no disputed material facts concerning the Defendants' application for registration of a trademark using false statements. The Defendants made application in their own names. They did not disclose to the United States Patent and Trademark Office that they had no rights to the mark because they had not made full payment under the August 10, 2017, Agreement. The Defendants also misrepresented to the U.S.P.T.O. that no one else had any rights to use the "American Metal" trademark. These statements were false. The Defendants knew that these statements were false when they made them. Because the Defendants knowingly made false statements to the U.S.P.T.O. to obtain registration for the "American Metal" trademark, the Court should grant Plaintiff's motion and issue an order declaring the Defendants' registration of the "American Metal" trademark cancelled.

(Doc. No. 58 at 12). In other words, Plaintiff argues that there is no genuine dispute that Defendants represented that they owned the rights to the American Metal trademark when in fact Plaintiff owned them, and that therefore Plaintiff is entitled to cancellation of the registration as a matter of law. Defendants correctly identify why the Agreement itself does not support Plaintiff's position here:

> MEG incorrectly states [that] the Defendants applied for a "registration of a trademark for the American Metal" series. (See Docket No. 58 at 4.) Defendants simply registered an image of a "stylized mountain stacked on top of the words 'American' and 'Metal,'" as evidenced [by] their application[.]
>
> . . . .
>
> . . . . MEG argues that Defendants failed to disclose that "they had no rights to the mark because they had not made full payment under the August 10, 2017 Agreement" or the Contract. (Docket No. 58 at 12.) MEG's argument reads language into the Contract that does not exist. The provision of the Contract that MEG references only discusses copyright, not trademark, as it simply reads: All video footage is copyright to and owned by MEG. Said copyright shall transfer to and become property of SPONSOR after final payment is made to MEG. (Docket 12-1 at 4.) (emphasis added). Not only does the above provision make no mention of trademark rights, the word "trademark" itself does not appear anywhere in the Contract. If MEG wanted to own any mark associated with "American Metal," it could have negotiated such a provision in the Contract. It elected not to do so. As a result, it cannot claim that Defendants violated their rights to the "American Metal" mark when the Contract gives them no rights to it in the first place.
>
> Further, MEG has not identified any other facts in the record showing that it owned the "American Metal" mark, or that Defendants did not own the American Metal mark. This is fatal to its § 1120 claim, because MEG cannot show that Defendants' registration of the mark at issue was fraudulent or based on any false statement.
>
> Despite MEG's efforts to conflate the protections provided by a Copyright and a Trademark, they protect different types of intellectual property.

(Doc. No. 66 at 9-11). In the Court's view, Defendants are entirely correct here as to whether Plaintiff obtained the rights to the American Metal trademark via the Agreement in particular. The Agreement provides Plaintiff with particular intellectual-property rights, namely the "exclusive

video rights" to "program content," including the *copyright* to video footage for the program. (Doc. No. 1-1 at 18). But the Agreement says nothing about rights to any trademarks—be they related to the program or unrelated to the program—including the particular trademark Plaintiffs alleged was falsely registered. And if there is an argument to be made that Plaintiff's rights under the Agreement nevertheless can be construed broadly enough to encompass the rights to this trademark,[17] Plaintiff does not make it; still less does Plaintiff show, as it must do successfully to obtain summary judgment on Count IV, that the Agreement as matter of law *must* be construed to allocate such trademark rights to Plaintiff.

In its reply in support of Plaintiff's Motion, (Doc. No. 73), Plaintiff asserts that it owned the rights to the American Metal trademark not by virtue of anything the Agreement said—an allocation in the Agreement of such rights to Plaintiff—but rather because ownership of trademark follows from the first use of the trademark, and such use-related ownership is credited to Plaintiff and not Defendants:

> As discussed in Plaintiff's original brief, ownership of a trademark comes from first use. The first use of the "American Metal" logo was in the television series owned by the Plaintiff. The Plaintiff, therefore, is the only owner of the logo. Had the Defendants made full payment under the contract, they would have gained those rights. However, they breached the contract and failed to pay. Therefore, they have no ownership rights to the trademark. This alone was a false representation in their application for the mark.

---

[17] Plaintiff seemingly hints at an argument that it would be inclined to make along these lines when, as Defendants note, it (incorrectly) claims that the American Metal trademark was a trademark "for the American Metal series." Plaintiff's broad characterization of the trademark broadly, as one "for the 'American Metal' television series," seems to be a harbinger for an argument that Plaintiff's ("video") rights to the series's "program content" would include the rights to the American Metal trademark. If Plaintiff intended to make such an argument, it likely would fail. To be sure, Defendants applied for (and received) registration of a trademark to be used on or in connection with "Entertainment services in the nature of a reality based television and multimedia program series." (Doc. No. 36-1 at 2; Doc. No. 36-2 at 1). But that is not to say that Defendants sought to register a trademark "for" the series or otherwise were claiming rights in the series; it registered a trademark *for* the logo—a logo whose extent of protection under federal law is to be assessed in light of the fact that the logo was to be used *in connection* with the series.

(Doc. No. 73 at 5). Plaintiff here is referring to the following discussion in its brief in support of Plaintiffs' Motion:

> Under Federal law, ownership of a mark "is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market." Homeowners Group v. Home Marketing Specialists, 931 F. 2d 1100, 1105 (6th Cir. 1991). The same rules apply under Tennessee law where evidence of ownership of a trademark typically involves proof of prior appropriation and use. Men of Measure Clothing, Inc. v. Men of Measure, Inc., 710 S.W.2d 43, 45 (Tenn. Ct. App. 1985).

(Doc. No. 58 at 10). Additionally, Plaintiff had noted in such brief that "[t]he application for the trademark for American Metal indicated that the first use of the mark was 'at least as early as 04/08/2018' which was the same date as the first airing of the television show." (*Id.* at 4).

The Court accepts for purposes of Plaintiff's Motion that these are accurate statements of the law and the facts. But Plaintiff does not, in either filing (Doc. No. 57 or Doc. No. 73), factually or legally develop the argument that such law, and considering the applicable facts, necessarily dictates the conclusion that Plaintiff, to the exclusion of Defendants, was the owner by virtue of first use of the mark in the market. Plaintiff claims that "Defendants were relying on the *content* of the television show to support their trademark application," (Doc. No. 58 at 4) (emphasis added), but this is inexact; it is more accurate to say that Defendants were relying on the American Metal trademark's *use in connection with the television show to support the application*.[18] It may be that Plaintiff has a strong legal argument to back up what it asserts here: that it became the owner of the American Metal trademark upon such mark's first use in connection with a television series to which Plaintiff (according to the Agreement) owned all video rights as to content. But Plaintiff's

---

[18] *See* 15 U.S.C. § 1051(a)(2) (requiring, as a general matter, a trademark application to specify, *inter alia*, the applicant's first use of the mark [in the market], the applicant's first use of the mark in [interstate or foreign] commerce, [and] the goods in connection with which the mark is used); 15 U.S.C. § 1053 (dictating subject to the provisions relating to the registration of trademarks, so far as they are applicable [to services marks], service marks shall be registrable, in the same manner and with the same effect a trademarks").

assertion is entirely conclusory, and Plaintiff does nothing to ensure the Court that, considering all relevant facts—including but not limited to those relating to whether Plaintiff or Defendants is properly credited with the first "use" in the market—Plaintiff as a matter of law is properly deemed to have been the owner of the American Metal trademark at the relevant time(s). Nor does Plaintiff identify what facts are relevant on this point, which ones are undisputed and why (considering what facts are or are not undisputed) the Court should find that there is no genuine dispute as to any material fact that could bear on the issue of who was the owner of the American Metal trademark by virtue of its first use in the market. Once again, Plaintiff has made only a skeletal argument, leaving it for the Court to put flesh on the argument's bones. Whatever potential such an argument may have, in its present cursory form it simply does not cut the mustard.

In short, Plaintiff has failed to show that there is no genuine issue of material fact as to the falsity of Defendants' representation in their registration application that they, and not Plaintiff, were the owners of the American Metal mark, and relatedly they have failed to show that they are entitled to cancellation of such mark as a matter of law on the grounds that Defendants made what as a matter of law amounts to a false representation in the application.

## DISCUSSION: DEFENDANTS' MOTION

Defendants seek summary judgment on all three of Plaintiff's remaining counts. The Court will address each count in turn.

A. Count I

Defendants first argues:

> In order to hold the Defendants personally liable for the alleged breach of contract, Defendants' theory of the case is that [Defendant] Raber signed the Contract on behalf of a general partnership between him and [Defendant] Aurich named Humvee Designs. (Ex. A at 8 "Responses Nos. 13-14.") If, at the time of contract formation, it truly was MEG's intent to bind Defendants individually,

> while Defendants' intent was to bind their LLC, there was no meeting of the minds
> as to a material term of the Contract – the identity of the parties

(Doc. No. 61 at 8). Along the same lines, Defendants argue that Plaintiff "cannot prove its breach of contract claim because [if Plaintiff did intend to bind Defendants individually] the Contract itself is void for a failure of meeting of the minds as to a material term – the identity of one of the contracting parties." (*Id.* at 9). On closer inspection, what Defendants are asserting here is that if, in litigating a breach-of-contract claim, the two sides in the litigation make different assertions about the true identity of the contacting parties, the claim necessarily fails because the (alleged) contract is unenforceable for lack of a meeting of the minds. The idea seems to be that if the parties express disagreement during subsequent litigation as to which parties were bound, they must not have had a meeting of the minds at the time of contracting as to the identity of the parties.[19]

For this proposition, Defendants cite no authority whatsoever. In fact, in this part of their argument, they cite only two cases, which collectively stand in relevant part only for the unexceptional proposition that an (alleged) contract is not enforceable unless it results from a so-called "meeting of the minds" of the parties regarding the terms of the contract and the identity of the contracting parties. (*Id.*). The Court accepts this proposition, but it cannot accept the implication that as a matter of Tennessee law the requisite "meeting of the minds" (whatever that metaphor actually means) cannot be shown by the plaintiff suing for breach of contract when two parties disagree during that litigation as to the identity of one (or more) of the contracting parties. Again, Defendants cite no authority for this proposition.

---

[19] The rationale appears to go like this: if one litigant were able in litigation to succeed in establishing that it intended for X party to be a contracting party, but the opposing litigant was able to establish that it intended for Y party rather than X party to be that contracting party, that would just go to show that the litigants did not have a meeting of the minds as to the parties to be bound.

Moreover, this proposition runs counter to how Tennessee courts—including some cited by Defendants to support their next argument, discussed below—have handled such situations. The cases do not reflect courts, when confronted with one litigant claiming it intended for one entity (or individual) to be the contracting party, and the opposing litigant claiming it intended for a different entity or individual to be that contracting party, deeming the contract unenforceable for lack of a meeting of the minds. Nor do the cases reflect courts ascertaining whether the two contracting sides *in fact* had different intentions as to the identity of the contracting party and, if so, declaring the (alleged) contract unenforceable for a lack of a meeting of the minds. Instead, where (as in the present case, as far as the record reveals) there exists no other impediment to the enforceability of the contract, courts (including *Int'l House of Talent, Inc. v. Alabama*, 712 S.W.2d 78, 87 (Tenn. 1986), cited by Defendants) undertake to determine who the contracting parties actually were. The Tennessee Court of Appeals has plainly suggested that this is a factual rather than legal determination, at least where the contract is ambiguous. *Garland v. Bonner*, No. 01A01-9710-CV-00570, 1998 WL 161105, at *2 (Tenn. Ct. App. Apr. 8, 1998) ("Although the trial court made no specific findings of fact, it is implicit from the trial court's judgment against Bonner personally that he found Bonner to have committed himself contractually as an individual.").[20] Other courts are in agreement, as is the undersigned. *See, e.g., Touchton v. Dover Corp./Rotary Lift Div.*, 319 F. Supp. 2d 1290, 1293 (N.D. Ala. 2004) ("Under Indiana law, the identities of the parties to a contract is [sic.] normally a matter of law if the contract is not ambiguous."); *In re Stafford's in the Field, Inc.*, 192 B.R. 29, 34 (Bankr. D.N.H. 1996) (noting that under New

---

[20] Like the parties, the Court herein cites various intermediate Tennessee appellate court decisions, some published and some unpublished. The Court is aware that it should rely on such decisions only to the extent it believes that they reflect what is (or would be) the view of the Tennessee Supreme Court, and it has just such a belief whenever it has cited an appellate court decision.

Hampshire law, the identity of parties to a contract "is a matter of fact for the trial court to determine"). And, as might be expected, the factual determination of the identity of parties to a contract is one for the jury where the contract is ambiguous in this regard. *Lashlee v. Harper's Chrysler*, No. M200700443COAR3CV, 2008 WL 3983120, at *5 (Tenn. Ct. App. Aug. 27, 2008) ("[H]aving thoroughly reviewed the record, we find that there is ample evidence from which the jury could have concluded that Dealer was indeed a party to the contract. Parol evidence is ordinarily admissible to establish the identities of the parties to a contract, and we find that, on these facts, the combination of written documents and parol evidence in the record created, at the very least, an issue of fact regarding whether Dealer was a party[.]") (citation omitted).[21] Sometimes the written contract is appropriately deemed unambiguous in this regard, such that the determination can (and must) be made without resort to parol evidence. Other times, the written contract is ambiguous in this regard, such that the determination can be made with consideration given to parol evidence; indeed, parol evidence is ordinarily admissible for this purpose. *Int'l House of Talent, Inc.*, 712 S.W.2d at 86 ("Parol evidence is ordinarily admissible to establish the identities of the parties to a contract or other legal instrument.").

All of this means that the Agreement is not unenforceable from the get-go merely because, if Plaintiff were to succeed in establishing that it intended for a general partnership to be the contracting party ("Humvee Designs") such that Defendants would be individually liable for breach of the Agreement, then such intention would conflict with what (according to Defendants) Defendants intended in this regard. The question here is whether Defendants have shown the absence of a genuine issue of material fact as to whether they can be liable on the Agreement, and

---

[21] To the extent that whether something is a jury question is a procedural issue that in this case would be governed by federal rather than Tennessee law, the Court is confident that the issue would be one for the jury under federal law just as under state law.

the question cannot be answered in the negative merely because the two sides disagree in this litigation as to identity of the counterparty to Plaintiff under the Agreement or because each side aims to show in this litigation that they intended Plaintiff's contractual counterparty to be someone (or something) different from what the other side aims to show it intended the counterparty to be.

As for what is the relevant question, as noted above, Defendants present another argument. Defendants claim that there is no genuine dispute that the parties mutually intended that Plaintiff's counterparty be an LLC associated with Defendants. Plaintiff's disputes this, making two different assertions that are not easily reconciled. First, in the SAC, it alleges "Defendants represented to Masters that Humvee Designs was an existing Arizona corporation. It was not; it is and was merely a business name used by Defendants to do business together." (Doc. No. 36 at ¶ 10.1). This appears to amount to an assertion that at the time of entering into the Agreement, Plaintiff intended its counterparty to be an "Arizona corporation." Second, in its briefing on the cross-motions, Plaintiff indicates in two places that it intended its counterparty to be a partnership.[22] (Doc. No. 69 at 6) (disputing Defendants' assertion that that "no one intended for Defendants to be individually bound to the contract as a partnership."); (Doc. No. 73) (disputing "[Defendants'] claim that the facts do not demonstrate that they held themselves out to be a partnership to the Plaintiff."). In a vacuum, this as-yet unexplained and unjustified inconsistency is not a good look for Plaintiff, certainly. However, it is not at all dispositive of the initial question for the Court here: whether Defendants have shown preliminarily that Plaintiff cannot adduce evidence sufficient for a jury to find Defendants individually liable.

---

[22] Notably, however, Plaintiff's primary argument seems to be that Defendants are individually liable because Defendants *in fact* were in a general partnership and Defendant Raber executed the Agreement on behalf of the general partnership. Its argument is not focused so much on whether Plaintiff *intended* that its counterparty be a general partnership.

Irrespective of the above inconsistency, the Court must answer that question in the negative. Plaintiff has plainly advanced two theories as to why Defendants are individually liable. The first posits that they are individually liable because Plaintiff's counterparty to the Agreement ("Humvee Designs") in fact was a general partnership (for whose debts Defendants are individually liable); in other words, Humvee Designs expressly is the counterparty, and (whether or not Plaintiff knew it or intended it) Humvee Designs was a general partnership comprising the two Defendants, so Defendants are on the hook for the counterparty's (alleged) breach of contract.[23] The Court sets this theory aside for the time being, and instead focuses on whether Count I survives based on Plaintiff's second, alternative theory.

This latter theory is based on the principle, mentioned above, that "in order for an agent to avoid personal liability on a contract negotiated on behalf of the agent's principal, 'the agent must disclose not only the fact of the agency, but also the identity of the principal.'" *ICG Link, Inc*, 363 S.W.3d at 550 (citing *Siler v. Perkins*, 126 Tenn. 380, 149 S.W. 1060 (Tenn. 1912); *accord Remote Woodyards, LLC v. Neisler*, 340 S.W.3d 411, 416 (Tenn. Ct. App. 2009). Plaintiff expressly relies on this principle in the SAC asserting therein that "Defendants may not escape personal liability by claiming that they intended HMMWV Designs, LLC to be the party to the contract[.]" (Doc. No. 36 at ¶ 8.6). The theory, in other words, is that if Defendants were acting on behalf of the LLC rather than a general partnership they had formed (contrary to Plaintiff's primary theory mentioned immediately above), Defendants are individually liable because the "identity" of the principal was not "disclosed" within the meaning of the quoted principle.

---

[23] As noted above, Plaintiff also suggests in two places (in clear contrast to its assertion in paragraph 10.1 of the SAC) that Plaintiff intended (which is to say, "understood" rather than "specifically hope for") its counterparty to be a general partnership, but Plaintiff does not really rely on its *intentions* in this regard.

As noted above, Plaintiff relies on this principle to assert that *it* is entitled to summary judgment on Count I, but that assertion ultimately is not adequately supported. (Doc. No. 58 at 9). But such principle still could prevent *Defendants* from obtaining summary judgment. And Plaintiff specifically argues that it does exactly that because (according to Plaintiff) Defendants "fail[ed] to disclose the existence of HMMWV Designs, LLC as the contracting party[.]" (Doc. No. 69 at 6).

To have a shot at summary judgment as to Count I, therefore, Defendants must show preliminarily the absence of a genuine issue of material fact as to whether they "disclosed" the "identity" of the principal on whose behalf they were acting, [24] *i.e.*, "Humvee Designs," Plaintiff's counterparty to the Agreement. That is, Defendants must show preliminarily that Plaintiffs cannot genuinely dispute that Defendants disclosed such identity. Defendants' position is that the counterparty was an LLC. (Doc. No. 61 at 1). As Defendants make clear throughout their briefing, the (only) LLC this possibly could have been was HMMWV, LLC; Defendants further make entirely clear their position is that was HMMWV, LLC that was the principal on whose behalf they were acting in executing the Agreement. (*E.g.,* Doc. No 61 at 2-3, 4, 5). The Court will accept the validity of that position *arguendo* in the following analysis.

In assessing whether Defendants have shown preliminarily that a reasonable jury would have to find that they "disclosed" the "identity" of this principal, the Court begins by looking at the Agreement. Indisputably, the Agreement identifies the principal as "Humvee Designs." This is, unsurprisingly, a major problem for Defendants. To disclose "Humvee Designs" is not to disclose "HMMWV, LLC." Nor is it to disclose *any* LLC, inasmuch as the agreement does not

---

[24] The Court realizes that Defendant Raber was the only agent who signed the Agreement on behalf of the principal (whoever it was), but discerns no reason (and no argument by Defendant Aurich) not to treat Defendant Aurich as also acting on behalf of such principal in consummating the Agreement.

identify "Humvee Designs" as an LLC or any other particular kind of entity, be it a corporation, general partnership, or anything else.

At times in their briefing, Defendants appear to suggest that disclosing that the counterparty was *an* LLC (whatever its name) is just as good for all relevant purposes as disclosing the full name of the LLC.[25] In case Defendants are making this suggestion, the Court will accept it *arguendo* for purposes of Defendants' Motion even though it is dubious; that is, the Court will assume that if Defendants had disclosed that they were acting on behalf of a principal that was an LLC, that would count as disclosing the identity of the principal even though the correct name of the LLC was never provided to Plaintiffs.[26]

Even with the Court making such a helpful assumption, Defendants cannot show a lack of a genuine dispute that they are to be credited with having disclosed the identity of the principal on which they were acting. Not having disclosed the *name* of the principal prior to the execution of the Agreement, Defendants are relegated to trying to show a lack of a genuine dispute as to whether they disclosed at least that the principal was an LLC. But since the Agreement indicates no such thing, Defendants must show that the contractual term "Humvee Designs" should be construed as referring to an LLC, and that indeed a reasonable jury would have to find that this is the case. This Defendants cannot do. To begin with, the Court notes that at best (from Defendants' view), the Agreement is ambiguous as to whether "Humvee Designs" is (refers to) an LLC. "In general

---

[25] The Court will not, however, go so far as to assume *arguendo* that if Defendants disclosed that they were acting on behalf of a[n] (unnamed) "company" (as Defendants allege, (Doc. No. 61 at 11)) or unnamed "corporation" (as Defendants note Plaintiffs have alleged, (*id.* at 11-12)), that counts as the disclosure of the "identity" of an LLC. It is one thing to say that it is immaterial that the *name* of the LLC principal was undisclosed, and quite another to say that it is immaterial that the *form* of the principal was undisclosed (or incorrectly disclosed). The precise name of a counterparty may ultimately prove immaterial, but the form of a counterparty seems almost by definition material.

[26] The name of the counterparty was stated in the Agreement, of course, as "Humvee Designs," and not "HMMWV, LLC" or even just "HMMWV." And the Court does not see where even Defendants claim that the name "HMMWV" was provided to Plaintiff until May 2018, nine months after the Agreement was executed. (Doc. No. 61 at 7).

terms, an ambiguity occurs where a word or phrase is capable of more than one meaning when viewed in the context of the entire agreement by an objective and reasonable person." *Tennessee Asphalt Co. v. Fultz*, No. E2013-00240-COA-R3CV, 2013 WL 5310527, at *4 (Tenn. Ct. App. Sept. 20, 2013). The identity of a contractual party can be ambiguous, just the way other contractual terms are. *Wise Constr., LLC v. Boyd*, No. E2009-01899-COA-R3CV, 2011 WL 864388, at *6 (Tenn. Ct. App. Mar. 14, 2011) ("The [contract] indicates two different entities as contractor. This presents an ambiguity."). Given that there is no reference to the form in which Humvee Designs exists, and certainly no reference to it being an LLC, the Agreement is ambiguous as to whether the contracting party, Humvee Designs, is an LLC.

"[Because] the language in the contract is ambiguous[,] proof is required to establish the identity of the actual contract[ing party]." *Id.* That is, as Defendants themselves note, "if the contract is ambiguous, [p]arol evidence is admissible to establish the identities of the parties to a contract." (Doc. No. 61 at 13 (citing *Int'l House of Talent, Inc.*, 712 S.W.2d at 86). So parol evidence is admissible on the question of whether the contracting party, Humvee Designs, was an LLC. And part of that inquiry into whether the contracting party properly is deemed to have been an LLC involves determining whether Defendants had disclosed as of the time of execution of the Agreement[27] that the contracting party was an LLC. All of which is to say that parol evidence is admissible on the question of

---

[27] *See Wescon, Inc. v. Morgan*, 699 S.W.2d 556, 559 (Tenn. Ct. App. 1985) (noting that the "'principal's status as disclosed, undisclosed or partially disclosed is ordinarily determined at the time of contracting.'") (quoting 3A *Fletcher Cyclopedia on Corporations*, § 1120, p. 183). The Court notes that a principal is deemed "partially disclosed" if the agent has disclosed that he or she is acting on behalf of a principle but has not disclosed the identity of the principal. *Bems, Inc. v. Shelter Com. Properties, Div. of U.S. Shelter Corp.*, No. 01-A-01-9006CV00223, 1991 WL 1049, at *4 (Tenn. Ct. App. Jan. 9, 1991) ("'Where the other party to a transaction conducted on the one side by an agent knows that the agent is acting for a principal and has notice of the principal's identity, the principal is considered as being "disclosed"; where he knows or has reason to know that the agent is or may be acting for a principal but is unaware of the principal's identity, the principal for whom the agent is acting is considered to be "partially disclosed"; where the third person has no notice of the fact that the agent is acting as such for a principal, the agency and principal are "undisclosed."'") (quoting 3 Am. Jur. Agency). In that situation, as noted herein, the agent is liable because the identity of the principal was not disclosed. *ICG Link, Inc.*, 363 S.W.3d at 550.

whether Defendants disclosed that Humvee Designs was an LLC. And unless Defendants can show preliminarily that a reasonable jury would *have* to find, based on such evidence, that Defendants disclosed Humvee Designs to be an LLC, then Defendants are not entitled to summary judgment on Count I, because Plaintiff's second theory of liability on Count I survives.

Defendants themselves make quite clear that they cannot make this showing. They assert that "it is clear that MEG and Defendants understood and intended that either Defendants' company, HMMWV, LLC, *or another corporate entity*, was contracting with Plaintiff." (Doc. No. 61 at 13) (emphasis added). Defendants go on to cite (and accept as credible) testimony of Plaintiff's representative, Mr. Plough, related to his understanding of who (or what) Plaintiff's counterparty would be; Mr. Plough refers to it as being a "company" and a "corporation." (*Id.* at 16-17). This assertion, and this evidence, is helpful to Defendants' argument, in opposition to Plaintiff's first theory of liability on Count I, that Humvee Designs was not, and was not understood to be, a general partnership. But it is devastating to Defendants' chances to defeat Plaintiff's second argument at the summary-judgment stage, because it reflects that not even Defendants contend that it is clear that Plaintiff's counterparty to the Agreement was an LLC, as opposed to a "corporation," or some other form of "company" or "corporate entity."

Perhaps Defendants' best argument here is that Defendant Raber signed the Agreement as "managing member." Considering that this term, used in its technical legal sense, refers exclusively to an LLC, this fact is evidence that Humvee Designs was disclosed to be an LLC. But it is far from exclusive. Defendants, after all, note the limitation on the probativeness of the terms that laypersons use to describe legal relationships. (Doc. Nos. 66 at 7; 121 at 1). Defendants do so specifically to dispute that Defendants represented themselves to amount to a legal cognizable general partnership merely because they called themselves "partners;" this makes sense because laypersons sometimes use terms inexactly and without legal technicalities in mind. But similarly, on the other hand, a layperson's mere reference to himself (especially if only once, on a signature line) as a "managing member" is not dispositive of whether Defendants should be credited with having disclosed that Plaintiff's counterparty was an LLC.

In summary, it appears undisputed that the at least the *fact* of Defendants' agency was disclosed. But absent the additional disclosure of the *identity* of the principal on whose behalf the Agreement was negotiated, the agents (Defendants, or at least Defendant Raber) is liable for breach of contract. And there is a genuine dispute of fact as to whether the identity of the principal was sufficiently "disclosed" under Tennessee law, even if all that was required was for Defendants to disclose that the principal was an LLC (whatever its name). The issue of whether the identity of the principal was "disclosed" within the meaning of the applicable Tennessee rule is one of fact to be determined, based on all applicable evidence, by the jury unless no reasonable jury could find that the principal was undisclosed.[28] *See Hutsell v. Kenley*, No. E2013-01837-COA-R3CV, 2014 WL 2949455, at *9 (Tenn. Ct. App. June 27, 2014). Because the Court cannot find that no reasonable jury could find that the principal was undisclosed, summary judgment must and will be denied Defendants as to Count I.[29]

Thus, even if Defendants could be deemed to have shown that Plaintiff cannot genuinely dispute that they had formed a partnership, Defendants because they have not made the preliminary showing (required of them as the summary judgment movant) that Plaintiffs cannot genuinely dispute that Defendants disclosed the identity of the principal for whom Defendants were acting. Thus, the burden does not shift to Plaintiff to show that there actually is a genuine dispute of material fact on Plaintiff's second theory of liability on Count I, and Defendants are not entitled to summary judgment on Count I.[30]

---

[28] Of course, *Hutsull* was applying Tennessee rather than federal procedural rules, and it was doing so after trial. But the gist of *Hutsull* applies under federal summary-judgment procedure: where the court cannot say that a reasonable jury would have to find in favor of the summary judgment movant, the movant has not shown the absence of a genuine issue of fact.

[29] The Court is aware that Defendant Aurich, not having signed the Agreement, may have a colorable argument that he cannot be found liable pursuant to this particular theory. But such argument has not yet been made.

[30] Notably, Defendants' Motion does not assert that the Agreement was not breached; rather, as to Count I, Defendants argue only that they are not liable for any breach of the Agreement that may have occurred.

B. <u>Count III</u>

In Count III, Plaintiff asserts a claim for fraud in the inducement of the Agreement. It is worth taking some time to unravel what Defendants allegedly misrepresented and why the alleged misrepresentations support this particular cause of action.

Plaintiff alleges that "Defendants represented to Masters that Humvee Designs was an existing Arizona corporation," when in fact "[i]t was not [and instead] was merely a business name used by Defendants to do business together." (Doc. No. 36 at ¶ 10.1). Relatedly, Plaintiff also alleges:

> Even after being forced to disclose that they had been misappropriating the intellectual property of a third party, Defendants continued to fraudulently represent the nature of Humvee Designs. Defendants induced Masters to continue working with them based upon the false and fraudulent assurances that Humvee Designs was a formal business entity of which Hero Customs, LLC was a d/b/a, knowing that such assertions were false and were made solely for the purpose of obtaining Masters' continuing work on the project.

(*Id.* at ¶ 10.8).

Plaintiff further alleges that "Defendants represented and specifically warranted to Masters that Humvee Designs had 'full right and legal authority to grant the rights granted' in the Contract and to 'perform its obligations' under the Contract," even though "Defendants did not, in fact, have the legal authority to grant the rights granted in the Contract or to perform its obligations under the Contract." (*Id.* at ¶¶ 10.2-10.3).

So in summary, Defendants allegedly "made numerous misrepresentations to Masters with regard to the corporate structure of Humvee Designs—indeed, they misrepresented the very existence of Humvee Designs—and the ability of Humvee Designs to perform its obligations under the Contract." (*Id.* at ¶ 10.6). As to the effects of these misrepresentations, Plaintiff alleges:

> Defendants' misrepresentations were material and were relied on by Masters in entering into the Contract with Defendants. Masters would not have

suffered ascertainable loss of income and out-of-pocket losses if Masters had known that Humvee Designs was fraudulently appropriating the intellectual property of a third party for its own monetary benefit.

. . .

As a direct and proximate result of Defendants' fraudulent inducement, Masters has suffered significant financial damages for which Masters is entitled to compensation from Defendants, including actual and punitive damages.

(*Id.* at ¶¶ 10.7, 10.11). These allegations harken back to more detailed allegations earlier in the

SAC regarding the nature and amount of damages from "appropriating the intellectual property of

a third party."

6.7 In order to comply with AM General's demands and Defendants' requests, Masters pulled Episode 6 of the American Metal cable television series from the air and began the painstaking and expensive process of reviewing and editing the remaining episodes of the series to remove infringing content.

6.8 Masters was forced to expend its own resources to re-edit the series to remove Defendants' infringing content. Examples of original images from the series followed by re-edited versions of the same images were previously filed as Exhibit L (Document No. 12-12).

6.9 Masters' efforts to re-edit the series to comply with AM General's demands were made more difficult and expensive because, for example, the persons depicted in the American Metal series wearing Humvee Designs-branded clothing were moving, thus requiring a high degree of skill to re-edit the images.

6.10 Because Masters was forced to remove certain of Defendants' episodes containing content infringing AM General's trademark from airing as scheduled, in order to comply with the requirements of the Contract with Defendants, Masters had to reschedule other shows.

6.11 Masters' re-editing of episodes of American Metal and rescheduling of other shows cost Masters, at a minimum, the sum of $60,000 in lost revenue and out-of-pocket expenses.

(Doc. No. 36 at ¶¶ 6.7-6.11).

Plaintiff accurately sets forth the nature and elements of a claim of fraudulent inducement

of contract under Tennessee law:

A claim for fraudulent inducement is closely associated with an intentional misrepresentation claim, as "[i]t arises when a person's willingness to enter into a contract is caused by another person's [intentional] misrepresentations with regard to a matter material to the contract." *Lowe v. Gulf Coast Dev., Inc*., 01-A-019010CH00374, 1991 Tenn. App. LEXIS 860, 1991 WL 220576, at *7 (Tenn. Ct. App. Nov. 1, 1991). In order to bring a successful fraudulent inducement claim, a plaintiff must prove that the defendant "(1) made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) the statement was reasonably relied upon, and (5) an injury resulted from this reliance." *Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011).

*Fulmer v. Follis*, No. W2017-02469-COA-R3-CV, 2018 Tenn. App. LEXIS 749, at *11-12 (Tenn. Ct. App. Dec. 20, 2018). Notably, both sides seem to accept the idea that a "misrepresentation" (conceived broadly and not necessarily limited to one or more false "statements") supports such a cause of action to the same extent as a "false statement," and the Court likewise will accept this notion for purposes of Defendants' Motion.

As indicated above, Plaintiff seems to allege two different misrepresentations: (i) that Humvee Designs was an existing Arizona corporation; and (ii) that Humvee Designs had the right to use the "Humvee" name in the America Metal television series.

Defendants begin by asserting that Plaintiff cannot show that Defendants made the first alleged misrepresentation. To meet its initial burden in this regard, Defendants point to the deposition testimony of Jeff Plough,[31] stating that he does not know whether Plaintiff's allegation that "Defendants represented to [Plaintiff] that Humvee Designs was an existing Arizona corporation" was true. (Doc. No. 61 at 24 (quoting Doc. No. 63-5 at 10)). This suffices to show preliminarily that Plaintiff appears to lack the stuff to back up its claim of a false representation.

---

[31] Defendants filed relevant portions of the transcript of this deposition at Doc. No. 63-5. From this document, (Doc. No. 63-5 at 1), it appears that Plough's deposition was a deposition of Plough himself, rather than a deposition of Plaintiff taken pursuant to Rule 30(b)(6). On the other hand, Plough testified that he was testifying as a representative of Plaintiff. (*Id.* at 3). Suffice it to say about Plough's testimony what the Court said above about Jones's testimony: whether or not Plough's testimony technically counts as the testimony of Plaintiff, it is highly indicative of what Plaintiff's position is and what information Plaintiff has to support its claims.

So the burden shifts to Plaintiff, who fails to meet that burden. Indeed, Plaintiff does not even attempt to meet it, forgoing any such attempt based apparently at least in part on the misguided belief that on this count "Defendants have chosen to focus solely on the issue of damages." (Doc. No. 69 at 10). So Plaintiff fails to raise a genuine issue of material fact as to whether Defendants represented (falsely) that Humvee Designs was an Arizona corporation, and Count III cannot survive based on the particular alleged misrepresentation.

That leaves the second alleged misrepresentation. As to this particular misrepresentation, Defendants do focus exclusively on the issue of damages, eschewing any attempt to dispute either that Defendants represented that Humvee Designs had the right to use the "Humvee" name in the America Metal television series, or that such representation was false. Defendants assert instead that Plaintiff lacks evidence of damages resulting from this misrepresentation. Plaintiff here is attacking the fifth element of this cause of action, *i.e.*, injury (which the parties imprecisely refer to it as "damages")[32] resulting from the misrepresentation. To support its assertion here, Defendants cite testimony of Jones that suggests: (i) that the alleged damages (amounting to $60,000) resulted from Plaintiff having to re-edit and reschedule episodes of American Metal (apparently to remove all references to "Humvee" that would suggest that Plaintiff's had rights to that name): (ii) that at particular junctures Jones was willing to forgo seeking recovery of such damages. The second suggestion indicates that Jones was not especially bothered by the damages allegedly sustained from this particular misrepresentation, but neither suggestion from Jones actually tends to indicate that Plaintiff lacks evidence of such damages.

Defendants next suggest that Plaintiff's response (or lack thereof) to its request for production of documents regarding such documents indicates that Plaintiff lacks evidence of them.

---

[32] The Court likewise generally will use the term "damages" in place of "injury," so that its discussion tracks more easily with the language of the parties' arguments.

Defendants explain that it requested all documents supporting the above-quoted allegations (from paragraphs 6.8 through 6.11 of the SAC) regarding the existence, nature, and amount of such damages. (Doc. No. 61 at 25 (citing Doc. No. 61-2 at ¶¶ 3-6)). Defendants also attach an affidavit from their counsel averring that he has reviewed Plaintiff's production of documents and has "not come across any documents illustrating that [Plaintiff] recorded any financial loss as a result of having to re-edit and reschedule the American Metal reality show." (Doc. No. 63-3, ¶ 5). Finally, Defendants cite Jones's deposition suggesting that if Plaintiff had in fact incurred the damages as alleged, they would be reflected in Plaintiff's books and record. (Doc. No. 61 at 25).[33] Defendants thereby meet their burden to show preliminarily that Plaintiff appears to lack evidence of the damages (in the amount of $60,000) allegedly resulting from the misrepresentation that Humvee Designs had rights to use the term "Humvee."

The burden thus shifts to Plaintiff to show otherwise, and Plaintiff has not done so. Plaintiff notes that "[t]he Defendants acknowledge that Mr. Jones testified to the cost of editing and rescheduling was $60,000.00." (Doc. No. 69 at 10-11). True enough; Defendants do acknowledge this. (Doc. No. 61 at 25). But they also asserted, poignantly and correctly, that this testimony was entirely unsupported. And Jones's unsupported (and self-serving) testimony effectively amounts to a mere scintilla of (entirely uncorroborated) evidence.[34] And a mere scintilla of evidence will

---

[33] Defendants here cite to a several-page section of Jones's deposition transcript. The precise testimony on this point —that the alleged $60,000 loss would be reflected in Plaintiff's books and records still retained by Plaintiff—is found in the record at Doc. No. 63-4 at 17.

[34] "The Court keeps in mind that even unsupported and self-serving statements can be credible under certain circumstances, although "[t]he Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported by additional evidence.'" *Jordan v. Matthews Nissan, Inc.*, 539 F. Supp. 3d 848, 878 n.40 (M.D. Tenn. 2021) (quoting *Johnson v. Buddy's Bar-B-Q, Inc.*, No. 1:13-CV-254, 2015 WL 1954454, at *5 (E.D. Tenn. Apr. 29, 2015)). Here, the Court views Jones's testimony with great scrutiny because it is unsupported by additional evidence under circumstances where it is particularly clear that if such additional (documentary) evidence existed, Plaintiff would have had every incentive to produce such documents to Defendants (and thus avoid a discovery violation) and to present it in response to Defendants' Motion. Ultimately, as noted above, the Court cannot call Jones's statements anything more than a "scintilla" of evidence.

not suffice to prevent summary judgment. *Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence . . . to a material fact is insufficient to forestall summary judgment."). To avoid suffering summary judgment based on a lack of evidence of damages, Plaintiff must do more than offer its corporate official's conclusory say-so regarding damages, at least where (as here) there is reason to view the statements regarding damages with great skepticism.

What Plaintiff needs to do is point the Court to evidence that these damages actually were incurred. By Jones's own testimony, that should be more than doable. But Plaintiff does no such thing. Instead, it seeks to get by primarily by saying that "[t]he nature of these damages . . . do not lend themselves to proof through documents." (Doc. No. 69 at 10). Given Plaintiff's use of the plural ("themselves"), it appears that Plaintiff here means to say not that the *nature* of the damages does not lend *itself* to proof through documents, *but* rather that the nature of those damages is such that that *those damages* lend themselves to proof through documents. But Plaintiff's assertion here falls flat because Jones specifically testified that these damages *do* lend themselves to proof through documents. (Doc. No. 63-4 at 16-18). Plaintiff digs an even deeper hole for itself when, continuing to insist that there are no documents to substantiate the existence of its claimed damages (such that its failure not present any such documents should not count against Plaintiff), it asserts:

> The re-editing was done in-house by salaried employees of the Plaintiff. Therefore, no invoice would ever exist to demonstrate this cost. Likewise, the loss in air-time due to the delayed airing of "American Metal" had to be made up by the loss of other television shows with other time slots. The Plaintiff used its existing air time to make these moves. Therefore, no additional time had to be bought and no invoice exists to document this loss.

(Doc. No. 69 at 10). Again, these assertions run counter to Jones's testimony that documentation of the alleged damages would exist. And in any event, the Court disregards these assertions, because they are factual assertions for which Plaintiff provides no citation to the record. For the

same reason, the Court likewise disregards Plaintiff's assertions (for whatever they would have been worth) that "if the shows had not been delayed, then the Plaintiff would have not had to use its other air time for showing 'American Metal,'" and instead "would have been able to use that time for new shows, and, therefore, earned additional revenue that it was unable to do." This assertion might have been supportable without much ado, but Plaintiff failed to support them.

And in any event, whether Plaintiff has "proof" of these damages "through documents" is not precisely at issue. Likewise, not at issue is whether Plaintiff has an excuse for not having "document[ary]" "proof" of these damages. What is at issue is whether Plaintiff has shown, as it must, that a reasonable jury could find evidence (which need not be documentary in nature even though Jones claimed that Plaintiff would have documentary evidence) sufficient to establish such damages. Plaintiff simply has not done so. There is a way to make this kind of showing. Whether or not it could have been made in this case, the fact remains it was not made. Thus, summary judgment will be granted to Defendants on Count III.

C. Count IV

As noted above, in Count IV, Plaintiff claims that Defendants obtained federal registration of the American Metal trademark via what Plaintiff deems false and fraudulent representations that Defendants owned the trademark and that no one else had rights to it. Plaintiff seeks damages allegedly incurred as a result of the allegedly improper registration, as well as cancellation of the registration obtained by Defendants.

As Defendants note, and Plaintiff does not dispute:

> To allege a claim for fraudulent procurement of a trademark registration, a plaintiff must allege: (1) a false or fraudulent representation of a material fact by the applicant in connection with obtaining the trademark; (2) knowledge that the representation was false; (3) the defendant's intent to induce the USPTO to rely on the misrepresentation; (4) reasonable reliance by the USPTO on the

misrepresentation; and (5) damages proximately caused by the defendant's misrepresentation.

*GFR, Ltd. V. Farner*, 1:18-CV-238, 2019 WL 1198538, at *3 (W.D. Mich. Mar. 14, 2019).

Defendants make two arguments as to why the claim fails, plus an additional argument as to why Plaintiff is not entitled to the specific remedy of cancellation of the trademark. Defendants first argue that Plaintiff lacks evidence sufficient to show the fifth element. Defendants cite to the deposition testimony of Plaintiff's president, Ted Jones,[35] noting that he answered in the negative when asked point blank (i) whether, as of the date of his deposition, Plaintiff had sustained any damages from the alleged improper registration of the trademark, and (ii) whether he had any estimation of what such damages might be in the future. (Doc. No. 61 at 21–22). This suffices to meet Defendants' initial burden of showing preliminarily that Plaintiff lacks evidence to establish the fifth element. Thus, it is incumbent upon Plaintiff to show that (despite Defendants' preliminary showing) it actually does have evidence sufficient for a reasonable jury to find the existence of the fifth element. Plaintiff comes up woefully short on this point. Plaintiff argues:

> The only basis for the Defendants' request for summary judgment is the bald assertion that the Plaintiff will not sustain any future damage from the Defendants' illegal and fraudulent acts. While the deposition testimony of Ted Jones establishes that MEG cannot establish with certainty the amount of the future damages but Mr. Jones makes clear that the cloud placed upon the intellectual property by the fraudulent registration means that MEG cannot offer the series at any price. That is the damage MEG suffers now and in the future. Therefore, the Defendants' motion must be denied.

(Doc. No. 69 at 9). This response is without merit in many ways. To begin with, it is untrue that this is "the only basis for defendant's request for summary judgment" on this Count; Defendants

---

[35] From the record, (Doc. No. 63-4 at 1), it appears that Jones's deposition was a deposition of Jones himself, rather than a deposition of Plaintiff taken pursuant to Rule 30(b)(6). On the other hand, Jones testified that he was testifying as a representative of Plaintiff. (*Id.* at 6). Suffice it to say that whether or not Jones's testimony technically counts as the testimony of Plaintiff, it is highly indicative of what Plaintiff's position is and what information Plaintiff has to support its claims.

had multiple other bases, noted above and discussed below. In addition, Defendants do not merely make a "bald assertion" that Plaintiff will not sustain any future damages from the alleged improper registration; instead (and in addition to pointing out Plaintiff's representative's admission of no existing damages), Defendants have pointed to Plaintiff's representative's testimony that he cannot give any estimation of what future damages might be and that he would be relegated to "guessing" about this. As noted above, this is sufficient to shift the burden to Plaintiff on this point, and so Plaintiff cannot rely on mere (misplaced) criticism of what Defendants have done, but rather must set forth specific evidence indicating that it has evidence sufficient to create a jury issue as to the fifth element. Plaintiff does not do so, except to mischaracterize its representative's testimony as "mak[ing] clear that the cloud placed upon the intellectual property by the fraudulent registration means that MEG cannot offer the series at any price." (Doc. No. 69 at 9). The testimony includes the words, "I can't offer it," but that phrase is so devoid of context that it cannot fairly be taken to mean, "I can't offer it at any price because Defendants [allegedly] improperly obtained registration of the American Metal trademark." For all the Court knows, that is what he meant. But that is just the point: the Court does not know what he meant. If this is what he meant, Plaintiff needed to make this clear, as for example by submitting an affidavit expressing such a view. Plaintiff did no such thing, and even if it had, it would have had to have gone further to flesh out (so that the Court does not have to guess) why it is not mere speculation to say that Plaintiff has suffered damages from Defendants' improper registration of the trademark.

In short, Plaintiff was challenged effectively, and point blank, on an essential element of a serious claim (serious because, among other things, it alleges fraud). It needed, but failed, to respond by pointing to evidence to enable the Court to conclude that a reasonable jury could find

the existence of damages from the alleged misrepresentations of exclusive ownership upon which the registration was based.

Defendants add the alternative argument that there was nothing false in Defendants' representations regarding ownership of the mark. They point out—as they did in opposing Plaintiff's Motion, as discussed above—that the language in the Agreement regarding ownership of intellectual property makes no mention of rights to any trademark(s). This is hardly conclusive on the issue of whether Defendants had exclusive ownership rights, or indeed even any ownership rights, to the American Metal trademark; after all, as Plaintiff notes, Plaintiff could have rights in that trademark by virtue of being credited with having first used the trademark in the market. But the Court is satisfied that Defendants have done enough to shift the burden on this point; when an agreement specifically notes that some kind(s) of intellectual property—described here as "copyright" and "exclusive video rights" to "all program content"—is "owned" by Plaintiff, the absence of any reference to Plaintiff owning another kind of intellectual property (the American Metal trademark) suggests at least preliminarily that Plaintiff lacks evidence to show such ownership.

Plaintiff suggests that the lack of reference to its ownership of the American Metal trademark is not probative because (as is true) *original* ownership in a trademark comes from the owner being credited with first using the trademark in the market. Plaintiff suggests that since original ownership of a trademark is not bestowed in the first instance by contract (but rather by first use in the market), it does not matter that the Agreement does not expressly identify Plaintiff as the owner of the American Metal mark. But the absence of a reference to Plaintiff being the owner of the American Metal mark is more conspicuous when one considers the specific reference to Plaintiff being the owner of the copyright(s) to the television show. Copyrights are exactly like

trademarks in that their *original* ownership does not arise by contract. Instead, 17 U.S.C. § 201 "vest[s] initial ownership of copyright upon *creation* and allowing for ownership of copyright to be 'transferred in whole or in part by any means of conveyance or by operation of law[,]'" which presumably would include by contract. *Ritchie v. Williams*, 395 F.3d 283, 285 n.1 (6th Cir. 2005) (emphasis added). So the Agreement refers to Plaintiff owning one kind of intellectual property (copyright) even though the Agreement itself did not originally create the ownership of it. This suggests: (i) that if particular intellectual property is not mentioned in the Agreement as being owned by Plaintiff, that is not because the Agreement itself does not create the ownership rights; and (ii) that the Agreement describes particular intellectual property owned by Plaintiff irrespective of whether the Agreement itself creates the ownership rights in that intellectual property. All of which is to say that by pointing to the absence of a reference to Plaintiff owning any trademarks, Defendants have done enough to show preliminarily that there is good reason to believe that Plaintiff does not own the American Metal trademark.

The absence of such a reference is not conclusive, however, and Defendants' preliminary showing is entirely subject to Plaintiff's prerogative to show otherwise. Shouldering the burden of showing that it owned the American Metal trademark even if the Agreement itself did not say so, Plaintiff conceivably could point to evidence that it owned the trademark by virtue of first having used it in the market. Plaintiff certainly *implies* that this is the case. But it is less clear that it expressly claims it to be the case. And more to the point, Plaintiff does nothing to make an evidentiary showing that it is the case. That is, Plaintiff did not point to any evidence suggesting that it, rather than Defendants, is creditable with having first made use in the market of the trademark; still less does it take care to explain why a jury could find this to be the case in light of applicable law specifically governing whether a party (or who among competing parties) is

properly credited with first use in the market. Defendants have it exactly right when they write in their reply that Plaintiff "provides no explanation, or cite to the record, as to why it had any ownership interest in the [American Metal] mark." (Doc. No. 74 at 5). It therefore has failed to meet its burden in opposing summary judgment based on this argument.

That leads to Plaintiff's request for equitable relief in the form of cancellation of the American Metal trademark pursuant to 15 U.S.C. § 1119. The Sixth Circuit has explained:

> That provision of the Lanham Act authorizes district courts to rule directly on the validity of a registration:
>
>> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.
>
> § 1119. Courts have held that the permissive language of § 1119, providing that the court "may" determine the right to registration, order cancellation of registrations, and the like, endows the district court with discretionary authority. *Empresa Cubana del Tabaco v. Culbro Corp.,* 541 F.3d 476, 478 (2d Cir.2008). Therefore, "[a] district court's determination to grant relief pursuant to 15 U.S.C. § 1119 is reviewed for an abuse of discretion." *Patsy's Italian Rest., Inc. v. Banas,* 658 F.3d 254, 264 (2d Cir.2011).
>
> A request for cancellation under § 1119 must be supported by a showing that (1) the party "has standing to petition for cancellation because it is likely to be damaged," and (2) "there are valid grounds for discontinuing registration." *Coach House Rest. v. Coach & Six Rests.,* 934 F.2d 1551, 1557 (11th Cir.1991).

*CFE Racing Prod., Inc. v. BMF Wheels, Inc*., 793 F.3d 571, 593 (6th Cir. 2015).

Regarding the second of these two elements, as indicated above, the alleged grounds for discontinuing registration are that Defendants falsely and fraudulently represented that they owned the American Metal trademark and that no one else had rights to it, when in fact Plaintiff owned it. As further noted above, Defendants shifted the burden to Plaintiff to show that a reasonably jury could find that these representations were false and fraudulent, and Plaintiff failed to meet this

burden. Thus, based on Plaintiff's failure to raise a genuine issue as to the second element, Plaintiff fails to avoid summary judgment as to its request for cancellation.

Defendants separately attack Plaintiff's ability to establish the first element, *i.e.*, likelihood of damage from registration. Citing Jones's testimony, they state that Plaintiff "can point to no facts in the record showing that it is likely to be damaged by Defendants' trademark." (Doc. No. 61 at 23). Consistent with its discussion above, the Court agrees that the citation to Jones's testimony suggests preliminarily that Plaintiff lacks evidence of *likelihood*—as opposed to the possibility or even plausibility—of such damages. So the burden shifts to Plaintiff to counter this preliminary showing, and Plaintiff fails to carry that burden. Consistent with the Court's discussion above, the testimony on which Plaintiff relies (amounting evidently to a single phrase towards the end of the same snippet on which Defendants also rely)[36] is far too cursory, conclusory, imprecise, and devoid of context to show a likelihood of damage from the registration of the American Metal mark.

Perhaps such a showing of a likelihood of damages could have been made, but it certainly was not made via relying exclusively on the briefest of snippets from Jones's testimony and a couple of unsupported sentences in counsel's brief as to the alleged effects of the registration of

---

[36] Plaintiff characterizes the precise testimony of Jones on which it relies as his testimony "establish[ing] that MEG cannot establish with certainty the amount of future damages but mak[ing it] clear that the cloud placed upon the intellectual property by the fraudulent registration means that MEG cannot offer the series at any price." Plaintiff must have been relying here on language in bold below set forth by Defendants in their brief in support of Defendants' Motion:

> Q. Can you give any estimations of what it might be in the future?
> A. No. I'm just guessing, you know, that **new networks spring up all the time, and right now, I can't offer it** so I can't answer that. I don't know how much they'd pay.

(Doc. No. 61 at 22) (quoting Jones Dep. 34:3-15) (emphasis added). Along with the above-referenced other problems with relying on this tiny snippet is the fact that it completely fails to explain *why* the particular "cloud . . . upon . . . intellectual property" here at issue—meaning the dispute between Plaintiff and Defendants *specifically about ownership of the American Metal trademark*, a dispute that has nothing to do with, for example, any third party's right to the "Humvee" trademark—means that Plaintiff cannot offer the "American Metal" series at any price. Perhaps such an explanation could have been provided and persuasive, but it was not provided by Plaintiff.

American Metal. Thus, Defendants' motion must be granted as to Plaintiff's request for cancellation based alternatively on the lack of a genuine issue of fact as to the existence of the first element.

## CONCLUSION

The outcomes on the cross-motions in this case turned, naturally enough, in part on whether the respective sides did what they (as the movant) needed to do to shift the burden or to meet the burden if indeed it was shifted to it (as the non-movant). The Court has taken pains to answer those questions properly in light of variances nuances in the record and in what the parties did and did not argue.

For the reasons set forth herein, Plaintiff's Motion (Doc. No. 57) will be DENIED in its entirety, while Defendants' Motion (Doc. No. 60) will be GRANTED IN PART and DENIED IN PART, *i.e.*, granted as to Counts III and IV and Denied as to Count I. Plaintiff's claim on Count I will proceed to trial.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE